E-FILED
Tuesday, 01 March, 2022  02:27:24 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| SHARILYN ANNE COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3250 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Sharilyn Anne Cook appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Cook filed a Brief in Support of Motion for Summary Judgment (d/e 13).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 16).  Cook filed Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment (d/e 17).  The parties consented to proceed before this Court.  Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Reference Order entered March 30, 2021 (d/e 12).  For the reasons set forth below, the Decision of the Commissioner is affirmed.

## BACKGROUND

Cook was born on March 25, 1964.  She completed high school and worked in accounting as a bookkeeper.  She protectively filed her application for Disability Benefits on May 10, 2018.  She initially alleged she became disabled on August 15, 2012, but subsequently amended her claim and alleged that she became disabled on May 4, 2016 (Onset Date).  The last date that Cook was insured for Disability Benefits was December 31, 2017 (Date Last Insured).  Cook suffered from the impairments of obesity, diabetes, hepatic steatosis, degenerative disc disease, asthma, and fibromyalgia.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8 and 9) (R.), at 13, 14, 16-18, 39, 40, 42.

## STATEMENT OF FACTS

### Evidence Submitted Before the Evidentiary Hearing

On April 26, 2016, Cook saw surgeon Dr. Rahul Basho, M.D., for a consultation.  Cook had experienced lower back pain for several years and in December the pain radiated down her right leg.  She had severe pain on standing and difficulty walking.  R. 1437.  On examination, she was in mild distress.  She had markedly positive straight leg raising tests on the right; she could walk on her heels, toes, and tandem walk; her strength was 5/5 throughout her extremities except her right leg, which was 4/5; she had

diminished sensation in the right L5-S1 distribution.  X-rays showed moderate disc space collapse at L4-5 and L5-S1.  Dr. Basho said that Cook's MRI showed a large right paracentral disc herniation at L4-L5 with facet arthropathy causing right lateral recess stenosis and assessed lumbar spinal stenosis and lumbar radiculopathy.  R. 1437-38.  Dr. Basho discussed options with Cook and told her that she was manifesting motor weakness, and so, he could not guarantee that surgery would improve her symptoms.  R. 1439.  Cook ultimately decided to have the surgery.

On May 4, 2016, the Onset date, Dr. Basho performed a right-sided L4-5 laminotomy, foraminotomy, and decompression of the lateral recess; and a L4-5 microdiskectomy.  R. 1429-30.

On May 17, 2016, Cook saw Dr. Basho for a postoperative follow-up.  Overall, Cook was doing well.  She reported that her pain symptoms were significantly improved.  R. 1428.

On June 21, 2016, Cook again saw Dr. Basho for a postoperative follow up.  Cook reported that she was essentially pain free.  She had some residual numbness in her right lower extremity.  On examination, Cook could go from a sitting to standing position independently.  Dr. Basho told Cook to follow up as needed and to maintain her core strength and to use safe lifting techniques.  R. 1427.

On August 11, 2016, Cook saw Dr. Basho.  She had twisted her body while gardening and experienced lower back and left-sided buttock pain. She reported that she went to the emergency room due to the pain and was given pain medication and steroids and her symptoms improved.  X-rays taken at the emergency room showed spondylosis and disc space narrowing at L4-5 and L5-S1.  Dr. Basho assessed recurrent back pain and prescribed the NSAID diclofenac and ordered an MRI of her lumbar spine. R. 1425.

On April 3, 2017, Cook went to the emergency room for shortness of breath for the prior two to three days.  She reported some chest discomfort with the shortness of breath and that she had a history of asthma and sleep apnea.  Humidity could trigger asthma exacerbation.  Cook also reported leg swelling and nausea with vomiting.  She had symptoms two weeks earlier which were resolved with steroid therapy and she was non-compliant with her CPAP machine.  R. 1013.  On examination, Cook was alert, oriented, and anxious; she had diminished breath sounds and decreased air movement, but no wheezing or rhonchi; her extremities showed no tenderness, edema, clubbing, or cyanosis.  R. 1022.  Blood

tests showed no troponin present.  R. 1024.[1] A chest x-ray showed no acute disease.  R. 1026.  A CT angiography showed no definite findings of pulmonary embolus and no definite acute findings.  R. 1031.  An ultrasound examination of her legs showed no evidence of deep venous thrombosis. R. 1034.  She was admitted and treated for asthma exacerbation and was discharged on April 7, 2017.  R. 1016-18.

On April 17, 2017, Cook saw pulmonologist Dr. Pranav Parikh, M.D. Cook reported that her asthma caused daytime symptoms one to two times a week and nighttime symptoms one to two times a month.  She did not know of any type of event that preceded her symptoms and her symptoms were not exacerbated by cold temperature, activity, inhaler use, lying down or smoking.  Her symptoms were relieved by her inhaler and oral steroids. R. 1172.  On examination, Cook was 65 inches tall and weighed 243 pounds.  She had a pain level of 0/10.  R. 1173.  Cook had full range of motion in her head and neck; she had decreased breath sounds to auscultation; she had trace edema in her left lower extremity; she had normal gait, station, and posture, and no digital clubbing or cyanosis; she

---

[1] The presence of elevated levels of troponin in the blood is an indication that the person suffered a heart attack.  See "Troponin Test," at NIH National Library of Medicine, located at Troponin Test: MedlinePlus Medical Test, viewed January 25, 2022.

had normal coordination; and she was alert and oriented with no neurologic focal deficits or gross deficits.  R. 1174.

On June 5, 2017, Cook saw Dr. Parikh and reported the same asthma symptoms as at her April 17, 2017 office visit.  R. 1176.  On examination, she had full range of motion in her neck; she had decreased breath sounds to auscultation; she had trace edema on the left lower extremity; she was alert, oriented, and had no neurologic focal deficits or gross deficits; she had normal gait, station, posture, and coordination, and no digital clubbing or cyanosis.  R. 1178.

On June 21, 2018, Cook prepared a Function Report-Adult form.  R. 226-33.  Cook said that her impairments caused severe pain in her lower back and hips, neuropathy pain in her feet, joint pain due to fibromyalgia, shortness of breath due to asthma, and an inability to concentrate due to sleep apnea.  R. 226.  Cook stated that in a typical day, she got up, bathed, ate breakfast, watched television, read, talked on the phone, ate lunch, napped, prepared supper, ate, watched television, and then went to bed. She used safety bars at her toilet and bathtub, but otherwise did not need assistance with her personal care, unless her back went out.  R. 227.  Cook also did some cooking and cleaning.  It took 90 minutes to prepare dinner and 15 to 30 minutes to prepare breakfast or lunch.  Cook also daily put

dishes in the dishwasher, twice a week did laundry with help carrying the laundry basket, and twice a week she did some light cleaning.  R. 228.

Cook said she went out daily, but high humidity sometimes limited her ability to go out due to her asthma.  She walked, drove, and rode in a car, and she could go out alone.  She went grocery shopping once a week, but someone went with her due to her back pain.  She went out to dinner with her husband one to two times a week and friends also sometimes came by for visits.  Cook said that she could pay bills, count change, and handle savings and checking accounts, however she sometimes forgot to pay bills.  R. 229-31.

Cook said that her impairments affected her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and concentrate.  She could walk a "couple hundred feet when using a cart to lean on."  She then had to rest for 15 to 30 seconds.  Her attention span varied from day to day.  She could follow written instructions but spoken instructions were harder to follow.  She got along with authority figures, but could not handle stress or changes in routine well.  R. 231-32.

On June 21, 2018, Cook also completed Physical Impairments Questionnaire.  R. 235-36.  She said she did not have enough strength to twist open jar lids.  Cook said questions about limitations on fine motor

skills such as using kitchen utensils, turning pages, or dialing a phone did not apply.  She could not bend over to pick up a coin or pen because of back pain.  She could carry grocery bags weighing up to 10 pounds but she had pain reaching overhead.  She was limited in turning her neck to the left and had lower back pain and sometimes her back "gives out" when entering or exiting a car.  She could sit for an hour, but then she needed to walk around.  She napped after lunch for an hour.  R. 235-36.

On July 17, 2018, state agency physician Dr. Sandra Bilinsky, M.D., prepared a Physical Residual Functional Capacity Assessment.  R. 83-85. Dr. Bilinsky opined that Cook could occasionally lift 20 pounds, frequently lift 10 pounds, sit for six hours in eight-hour workday, and stand and/or sit for six hours in an eight-hour workday.  Dr. Bilinsky said that Cook could frequently stoop, bend, crawl, and climb stair and ramps; and occasionally climb ladders, ropes, and scaffolds.  She should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  Dr. Bilinsky found no other limits on Cook's functional capacity.  R. 83-85.

On September 20, 2018, Cook saw Dr. Justin Imhof, D.O., for a follow up after a tonsillectomy performed on September 4, 2018.  Cook had a history of recurrent tonsillitis as well as obstructive sleep apnea.  She reported that she was doing much better after the surgery and had stopped

taking her pain medication.  On examination, Cook was healing

appropriately and had good range of motion in her neck.  R. 1190.

On October 9, 2018, Cook saw Dr. Basho again for neck and arm

pain.  Beginning in June 2018, she had significant neck pain that radiated

into her left arm.  She also had pain that radiated down her right arm and

reported decreased grip strength.  She rated her current pain at 6/10, but

8/10 over the prior two weeks.  R. 1423.  On examination, Cook had 5/5

strength throughout her upper extremities; she had a positive Tinel's sign in

the medial epicondyle; she was limited in rotating her head to the left; her

sensation was intact from C5-T1.  An MRI showed left paracentral disc

herniation at C6-C7 and a broad-based disc bulge at C5-C6.  X-rays

showed a bony foraminal stenosis on the right at C3-C4 and a mild sic

space collapse at C5-C6.  R. 1423.  Dr. Basho assessed cervical

radiculopathy and signs and symptoms of cubital tunnel syndrome on the

right and recommended an EMG/nerve conduction study of the right upper

extremity and a C6-C7 epidural steroid injection.  R. 1424.

On November 5, 2018, Cook saw Dr. Joseph Newton, D.O., for back

neck, and hip pain.  Cook rated her pain in her neck, low back, right arm,

and wrists at 6/10.  She said the arm pain was starting to extend to her

wrist with numbness and tingling.  Dr. Newton noted that the EMG/nerve

study on Cook's right upper extremity came back with normal findings.  On

examination, Dr. Newton observed tightness in Cook's cervical paraspinal

muscles with decreased rotation to left and right, greater restriction on the

left.  She had decreased rotation in her right shoulder and tenderness in

her right elbow.  A cervical MRI from September 17, 2018 showed a disc

protrusion at C6-C7 abutting and mildly deforming the left lateral cord;

severe left neural foraminal stenosis at C3-C4; and milder degenerative

changes at C7-T1.  A hip MRI on September 17, 2018 showed

osteoarthritis of the hip joints with a possible right acetabular labral tear.  R.

1245.  An August 22, 2018 lumbar MRI showed post-operative changes at

L4-L5 and mild acquired spinal stenosis.  Cook wore a brace on her left

elbow and took ibuprofen for pain.  Dr. Newton scheduled her to receive an

epidural injection for her hip.  R. 1245-46.

On November 6, 2018, Cook saw pain specialist Dr. Howard Dedes,

M.D.  Her pain symptoms had gradually worsened since June 2018 and

she had trouble turning doorknobs due to pain.  She also had difficulty

turning her head from side to side.  She rated her pain at 7/10 and said it

was continuous.  The pain affected her mood, walking ability, sleep, and

enjoyment of life.  It was made worse by standing, sitting, bending forward

or backward, coughing, and sneezing and was improved with movement

and lying down.  She reported weakness.  R. 1250-51.  On examination, her sensation was intact, and she walked without assistive devices; her upper extremities showed functional strength no atrophy, and intact range of motion; her cervical spine and cervical paraspinals were tender to palpation.  Spurling's maneuver increased pain into the left shoulder, and facet loading increased neck pain.  Dr. Dedes reviewed Cook's x-rays and MRIs.  On November 8, 2018, Dr. Dedes administered a cervical epidural injection into Cook's cervical spine at C6-C7.  R. 1259-61.  Her pain after the procedure was reduced to 0/10.  R. 1261.

On November 27, 2018, Cook again saw Dr. Basho.  Cook said she received significant relief from the injection in her cervical spine at C6-C7, but the symptoms had returned.  Dr. Basho said Cook's physical exam had not changed from the last visit.  Her cervical MRI showed a disc herniation at C6-C7 and a broad-based disc bulge at C5-C6 with foraminal stenosis at both levels.  Dr. Basho scheduled a second injection in her cervical spine at C6-C7.  R. 1421.

On December 20, 2018, Cook saw Dr. Basho. Cook reported that the second injection in her cervical spine was not effective.  On examination, she went from sitting to standing independently and walked with a positive sagittal balance.  Dr. Basho said that her lumber MRI showed lateral recess

stenosis at L4-L5 with a previous laminotomy defect noted on the right at L4-L5 and degenerative disc disease at L4-L5.  Her cervical MRI showed disc herniation at C6-C7 and moderate foraminal stenosis at C5-C6.  Dr. Basho recommended a translaminar injection at L4-L5.  R. 1419.

On January 2, 2019, state agency physician Dr. Michael Nenaber, M.D., prepared a Physical Residual Functional Capacity Assessment of Cook.  R. 94-97.  Dr. Nenaber opined that Cook could occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday.  Dr. Nenaber said Cook could frequently stop, bend, crouch, crawl, and climb ramps and stairs; and occasionally climb ladders, ropes, and scaffolds.  Dr. Nenaber said Cook should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  R. 94-96.

On January 3, 2019, Cook saw oncologist Dr. Arif Bari, M.D.  Cook had seen Dr. Bari since 2017 for persistent thrombocytosis, likely reactive. She came to this appointment with her nine-month-old grandson for whom she babysat.  She noticed some improvement in her neck movement since she received injections from Dr. Basho, "but not a whole lot."  R. 1198.  On examination, Cook had limited range of motion in her neck.  She had no

edema in her extremities and no bony tenderness in her spine.  Dr. Bari assessed mild reactive thrombocytosis, stable.  R. 1200-01.

On February 14, 2019, Cook saw Dr. Basho for her neck and arm symptoms and her right-sided thigh pain.  She reported that Dr. Newton recently gave her an injection in her right hip but the injection was ineffective.  On examination, Cook had "exquisite tenderness over the right trochanteric bursa."  Her straight leg raising tests were negative on the right.  Her cervical and lumbar MRIs showed disc herniation at C6-7, a broad-based disc bulge at C5-6, a broad-based disc at L4-5, no central stenosis, degenerative disc disease at L4-5, L5-S1, and to a lesser degree at L3-4.  Dr. Basho told Cook the injections in her cervical spine had been ineffective and they discussed the possibility of surgery on her cervical spine versus further injections.  Dr. Basho stated that Dr. Newton was treating her trochanteric bursitis, but he mentioned that she could attempt exercises and further injections.  R. 1416.

On February 25, 2019, Cook saw Dr. Matthew Cormier, D.O, to establish primary care.  Cook reported that Dr. Basho felt injections would not work anymore for her neck and she would need neck fusion surgery. She reported back pain but no joint pain in the review of her systems. R.

1229.  On examination, Cook was alert and in no acute distress.  Her musculoskeletal exam was unremarkable.  R. 1230.

On March 4, 2019, Cook saw orthopedic surgeon Dr. Mark Gold, M.D., for pain in her neck, lower back, and right hip.  The neck pain radiated into both shoulders and her pain had worsened over the past few months.  She also reported pain in her right elbow with numbness and tingling in her right hand and fingers.  She rated her pain at 6/10 at best and 9/10 at worst.  She had two epidural steroid injections which gave significant relief for several weeks.  She said she could walk for 15 to 20 minutes.  R. 1338.  On examination, Cook was five feet four inches tall, weighed 235 pounds, and had a body mass index (BMI) of 40.34.  She appeared uncomfortable but in no acute distress.  She had normal muscle bulk with no atrophy and tenderness over the cervical facet joints.  She had no cervical or lumbar muscle spasm or tenderness.  She had a normal gait and her motor strength in her extremities was normal and her sensation to light touch was intact.  R. 1341.  Dr. Gold noted a September 17, 2018 MRI showed cervical spondylosis with moderately severe to severe neuroforaminal stenosis on the left at C3-4 and C6-7, as well as some neuroforaminal stenosis on the right at C6-7 and mild compression of the spinal cord on the left.  R. 1341.  Dr. Gold concluded that Cook had some

type of diffuse pain syndrome, likely myofascial pain syndrome and further concluded that Cook would not be a good candidate for surgery.  R. 1342.

On April 16, 2019, Cook saw Dr. Basho.  She reported continuing neck and arm pain and stated that she was able to tolerate her symptoms and was functioning at a reasonable level.  R. 1415.

On July 30, 2019, Cook saw Dr. Basho.  Her lower back and leg had become "more bothersome to her."  She was caring for her mother-in-law who had cancer.  Her mother-in-law fell and Cook attempted to hold her and believed she injured her back at that time.  On examination, Cook had a positive straight leg raising test on the right.  Her most significant pain was in her right buttock.  She was "otherwise neurovascularly intact."  Dr. Basho assessed right lumbar radiculopathy and recommended an updated MRI of her lumbar spine.  R. 1414.

On July 31, 2019, Cook saw Dr. Bari for a follow up on her thrombocytosis.  She reported that her mother-in-law was staying with her. R. 1210.  On examination, Cook had tenderness over the lumbar and cervical spine with limited range of motion in her neck.  Dr. Bari assessed mild stable reactive thrombocytosis.  R. 1212-13.

On August 21, 2019, Cook saw Dr. Cormier.  She reported sinus pressure for a couple of weeks with fatigue and shortness of breath when

walking outside.  Heat and humidity affected her breathing and she used her inhaler on a regular basis.  She also reported that her back and hip pain continued.  R. 1218.  On examination, Cook was alert and in no acute distress; her nasal passages were congested; her lungs were clear to auscultation with no wheezes, rhonchi, or rales; her extremities showed no clubbing, cyanosis, or edema.  R.1219.

On October 15, 2019, Dr. Cormier completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) form.  R. 1448-51.  Dr. Cormier opined that Cook could lift 10 pounds occasionally and less than 10 pounds frequently; stand and walk for less than two hours in an eight-hour workday; sit for less than two hours in an eight-hour workday; sit for 30 minutes at one time; and stand for 20 minutes at one time.  Dr. Cormier stated that Cook would need to walk around more than 16 times, for 10 minutes each time, in an eight-hour workday; and would need the opportunity to shift at will from sitting to standing or walking.  Cook would also need to lie down a couple of times during an eight-hour workday. Dr. Cormier opined that Cook could never twist, stoop, bend, crouch, climb stairs, or climb ladders.  He said that Cook would occasionally reach and feel, frequently handle, and constantly feel.  Dr. Cormier opined that Cook could never push or pull with any of her extremities.  R. 1448-49.  Dr.

Cormier listed as the medical findings for his opinions the August 22, 2018 lumbar MRI that showed a history of lumbar spinal surgery with resulting lumbar spinal stenosis; the September 15, 2018 pelvis MRI that showed osteoarthritis of the hips with a right labral tear; and the March 5, 2019 cervical MRI that showed severe left neural foraminal stenosis at C3-C4 and a disc protrusion at C6-7.  R. 1448.  Dr. Cormier also cited limited range of motion in the lumbar spine.  Dr. Cormier said Cook had to turn her entire upper body to look left or right.  R. 1449.

Dr. Cormier opined that Cook should avoid concentrated exposure to perfumes, and all exposure to extreme cold, heat, high humidity, fumes, odors, dusts, gases, solder fluxes, solvents/cleaners, and chemicals.  Dr. Cormier cited as medical support that Cook had chronic obstructive pulmonary disease (COPD) with asthma.  R. 1450.  Dr. Cormier said that Cook would miss more than four days of work per month if she worked fulltime and would be off task more than 25 percent of the time while she was at work.  He opined that Cook would need unscheduled breaks at work every hour for at least 10 minutes each time.  Dr. Cormier agreed with Cook that her disability began August 15, 2012.  R. 1451.

<u>The Evidentiary Hearing</u>

On October 28, 2019, an Administrative Law Judge (ALJ) conducted an evidentiary hearing in this case.  33-77.  Cook appeared in person and with her attorney.  Vocational expert Bob Hammond also appeared by telephone.  R. 35.

Cook testified first.  She was married and lived with her husband and had three adult children.  She graduated from high school.  R. 41-42.

Cook said she had daily headaches, usually after lunch.  Each headache lasted 30 minutes to five hours.  On average, the headaches lasted two hours and also caused light sensitivity and nausea.  When she got a headache, she took Tylenol and laid down until the headache went away.  About three times a week, she fell asleep when she laid down with a headache.  The headaches were worse since her spinal surgery.  R. 42-45.

Cook indicated she had problems with her neck.  She had constant pain in her neck which started after her spinal surgery.  The pain made her nauseous and caused her balance to be off and radiated down her shoulders into her arms at least once a day.  She also could not turn her head to the left; if she tried to turn to the left, she experienced shooting pain from the base of her head down into her shoulders.  R. 45-48.

Cook said she dropped things with her right hand and had shooting pain in her right arm.  Once a week she had numbness and tingling in her right hand.[2]  The numbness and tingling started in her fingertips and went to her wrists and lasted for 15 to 20 minutes.  She had these problems with her right arm and hand for at least two years.  R. 48-50.

Cook testified that she had problems with shortness of breath due to her asthma.  She estimated she could walk 75 yards before she became short of breath and had to sit down and rest for 10 minutes.  She estimated that she could walk 75 yards up to four times in an eight-hour workday.  She believed she would need to lie down for 30 minutes to an hour after the fourth walk.  R. 50-53.

Cook noted that her surgery in 2016 relieved her back pain for three months and reported she collapsed due to the pain three months to the day after her surgery.  Cook had pain in her lower back every day that radiated into her right hip.  The pain was burning and tingling.  She said, "it's like you lose control of a certain strength in your leg."  R. 54-55.  She had the pain all day every day and walked with a limp due to the pain.  Nothing relieved the pain and physical therapy and pain management did not help.

---

[2] Cook initially said she had numbness and tingling in both hands.  R. 49.  She later said she did not have any problems with her left hand.  R. 50.

She lay down for an hour once in the morning and once in the afternoon due to the pain.  She has been lying down twice a day since the 2016 back surgery and also iced her back once a day for three hours, twenty minutes on, twenty minutes off.  R. 53-57.

Cook had numbness from neuropathy in her feet and legs, worse on the right.  The numbness sometimes felt like needles poking her. It started in her toes and went up to her knees.  She felt unbalanced because of the numbness and experienced the numbness every day, usually in the mornings for an hour when she woke up.  She experienced the numbness other times of the day about three to four times a week and the numbness was constant in her right leg.  R. 58-59.

Cook noted that she had swelling in her right foot that started in her toes and went up to her ankles.  Her foot swelled every day for six hours.  She wore compression socks and elevated her foot.  R. 60.

Cook used a CPAP machine at night to sleep.  She woke up every two to three hours and never felt rested after sleep.  She rated her energy level as "very, very, low."  R. 61-62.

Cook said she could drive for about 30 minutes, but after 30 minutes in a car, she needed to walk around because she had sciatic nerve pain.  She could walk to grocery shop for 30 minutes without stopping because

she leaned on to the cart.  She was "totally wiped out" after shopping and took a nap for an hour afterward.  R. 65.  Around the house, Cook put clothes in the washing machine, but her husband took the clean clothes out of the dryer.  Her husband vacuumed and put dishes in the dishwasher. She did not do any yardwork.  She dressed herself but did so very slowly because putting on socks and shoes wore her out.  She wore slip-on shoes because they were easier to get on.  She sat in a shower chair to shower. R. 66-68.

Cook said that from 9:00 a.m. to 5:00 p.m., she slept two hours every day.  She could sit for 30 minutes and stand for 15 to 20 minutes and she could lift a maximum of two pounds.  She could not bend without pain and could squat if she had something to hang onto to get back up.  R. 69-71.

Vocational expert Hammond then testified.  Cook's attorney had no objections to Hammond testifying as an expert.  R. 71-72.  Hammond classified Cook's past relevant bookkeeping job as an accounting clerk under the Department of Labor's Dictionary of Occupational Titles.  R. 72. The ALJ asked Hammond the following hypothetical question:

> Q Okay. I'd like you to assume a hypothetical individual of the Claimant's age and education and with the past work that you just described. Further assume that this individual is limited to work at the sedentary exertion level, but can never climb ropes, ladders or scaffolds; can only occasionally climb ramps and stairs; occasionally balance, as defined in the DOT and SCO;

occasionally stoop, kneel, crouch or crawl; and avoid
concentrated exposure to extreme heat, extreme cold, humidity,
vibration and respiratory irritants such as dust, fumes, odors,
gases and poor ventilation.
Can the hypothetical individual perform any of the
Claimant's past work?

R. 72-73.[3]  Hammond opined that such a person could perform Cook's past

work as an accounting clerk as generally performed and as Cook actually

performed her job.  R. 73.

Hammond opined that the person could not work if she had to take

additional unscheduled breaks during the day.  R. 73.  The person also

could not work if she could only stand and or walk for less than two hours in

an eight-hour workday, and she could not work if she could only sit for less

than two hours in a workday.  The person could not work if she needed to

lie down during the workday.  The person could not work if she was off task

25 percent of the time.  The person also could not perform Cook's past

relevant work if she was limited to occasionally reaching and feeling.  R.

74-76.  The hearing concluded.

---

[3] The SCO is the Department of Labor's publication, <u>Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupations Titles</u>.

## THE DECISION OF THE ALJ

On November 26, 2019, the ALJ issued her decision.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her past relevant work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled

considering her RFC, age, education, and past work experience.  20 C.F.R.

§§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has

the burden of presenting evidence and proving the issues on the first four

steps.  The Commissioner has the burden at Step 5 to present evidence

that, considering the listed factors, the claimant can perform some type of

gainful employment that exists in the national economy.  20 C.F.R. §§

404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir.

2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Cook met her burden at Steps 1 and 2.  She had

not engaged in substantial gainful activity since the Onset Date and she

had severe impairments of obesity, diabetes, degenerative disc disease,

asthma, and fibromyalgia.  R. 16.  The ALJ found that Cook's other

medically determinable impairments were not severe.  R. 16-18.  The ALJ

found that Cook's impairments or combination of impairments did not meet

or equal a Listing.  R. 18.

The ALJ then determined that Cook had the following RFC:

5. After careful consideration of the entire record, the
undersigned finds that, through the date last insured, the
claimant had the residual functional capacity to perform
sedentary work as defined in 20 CFR 404.1567(a) except that
she can only occasionally climb ramps and stairs, and never
climb ladders, ropes or scaffolds. She can occasionally balance
(as defined in the DOT and SCO). She can occasionally stoop,
kneel, crouch and crawl. She must avoid concentrated

exposure to extreme heat, extreme cold, humidity, vibration,
and respiratory irritants, such as dust, fumes, odors, gases, or
poor ventilation.

R. 18.  The ALJ relied on Cook's medical records from the Onset Date to
the Date Last Insured.  These records showed that Cook's spine was pain
free after her surgery on the Onset Date in 2016.  She complained about
back pain one time in August 2016 to her surgeon Dr. Basho.  Dr. Basho
treated her with NSAIDS.  At the August 2016 office visit, Cook also
reported that she went to the emergency room and the pain was relieved
with treatment.  The records before the Date Last Insured also showed that
Cook was hospitalized one time for asthma exacerbation in April 2017, but
her asthma was otherwise stable and treated with inhalers and steroids.
The ALJ found that the other records before the Date Last Insured did not
show disabling symptoms.

The ALJ also considered the evidence after the Date Last Insured.
The ALJ considered the medical records regarding Cook's recurring back
pain, as well as shoulder and arm pain, beginning in October 2018.  The
ALJ relied on examination records that generally showed normal strength,
normal sensation, normal range of motion, posture, and gait.  The ALJ said
that no healthcare provider observed any limitations on Cook's ability to sit,
stand, walk, bend, squat, or stoop.  The ALJ noted that the records do not

show any long-term atrophy or spasms.  The ALJ additionally relied on medical records which indicated Cook's asthma and diabetes were controlled.  R. 25.  The ALJ also relied on the opinions of Drs. Bilinsky and Nenaber.  The ALJ, however, found that the other evidence in the records required an RFC that limited Cook to a limited range of sedentary work rather than light work as Drs. Bilinsky and Nenaber found.

The ALJ discounted Cook's statement about the limiting effect of her symptoms because the evidence did not completely support her allegations.  The ALJ also found that the medical records were more persuasive than her testimony and other statements.  R. 20, 21, 26.

The ALJ found that Dr. Cormier's October 2019 opinions were not persuasive because he first treated Cook in February 2019, long after the Date Last Insured, which was December 31, 2017, and because he only saw Cook twice.  The ALJ also found that Dr. Cormier's examination records did not support his opinions, "particularly the findings that she would require periods of lying down or elevate her legs, or that she would miss work or be off task as much as noted by Dr. Cormier."  The ALJ further found that the other medical records did not support Dr. Cormier's opinions.  R. 24.

After determining the RFC, the ALJ found at Step 4 that Cook could perform her prior work as an accounting clerk through the Date Last Insured.  The ALJ relied on the RFC determination and the opinion of vocational expert Hammond.  The ALJ concluded that Cook was not disabled through the Date Last Insured.  R. 26-27.

Cook administratively appealed the decision of the ALJ.  On July 30, 2020, the Appeals Council denied Cook's request for review.  The decision of the ALJ then became the final decision of the Defendant Acting Commissioner.  R. 1.  Cook then filed this action for judicial review.

<u>ANALYSIS</u>

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.  <u>Jens v. Barnhart</u>, 347 F.3d 209, 212 (7th Cir. 2003); <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to her conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the decision is supported by substantial evidence.  The issue before the ALJ was whether Cook was disabled on or before the Date Last Insured, December 31, 2017.  See 42 U.S.C. §§ 416(i) and 423; Eichstadt v. Astrue, 534 F.3d 663, 665-66 (7th Cir. 2008).  A disability is the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. See 42 U.S.C. § 416(i).  The medical records before the Date Last Insured show a successful surgery in May 2016, one recurrence of back pain in August 2016, one hospital stay for an exacerbation of asthma in April 2017.

After the Date Last Insured, the medical evidence shows problems with Cook's throat that improved after she underwent a tonsillectomy in September 2018.  Cook cites no other medical records that contain any report of any disabling symptoms or a medically determinable impairment causing functional limitations until she went back to see Dr. Basho in October 2018, more than nine months after the Date Last Insured.

The medical evidence after October 2018 shows impairments of the lumbar and cervical spine with pain that radiated into her extremities.  Many of the examination notes on and after the October 2018 show normal gait, range of motion, strength, and sensation, but some notes showing limitations in her gait and in the mobility of her neck.  Drs. Bilinsky and Nenaber reviewed the evidence and opined that Cook could perform a limited range of light work through her Date Last Insured.  The lack of medical evidence of disabling impairments prior to the Date Last Insured and nine months thereafter, taken together with the opinions of Drs. Bilinsky and Nenaber, provide substantial evidence to support the ALJ's determination of Cook's RFC up to the Date Last Insured.

The ALJ also provided substantial evidence to support her findings that Dr. Cormier's opinions were not persuasive.  The ALJ was required to discuss the consistency of Dr. Cormier's opinions with the evidence in the

record and the supportability of Dr. Cormier's opinions with evidence in the record.  20 C.F.R. § 404.1520c(b)(2).  She did so.  The ALJ found that Dr. Cormier's opinions of extreme disabling symptoms were not consistent with the other evidence in the medical records and were not supported by the medical records.  The ALJ cited numerous examination records and noted that none showed the degree of limitation to which Dr. Cormier opined.  The ALJ also considered the fact that Dr. Cormier only saw Cook twice and did not see her at all until February 2019, long after the Date Last Insured.  All this provided substantial evidence to support the ALJ's consideration of Dr. Cormier's opinion.

The ALJ's evaluation of Cook's statements about her symptoms was also supported by substantial evidence.  Cook testified that she had debilitating back pain, leg pain, shoulder pain, and arm pain starting in August 2016 and it continued.  She testified that she collapsed due to the pain three months after her surgery.  The medical records showed that she went to see Dr. Basho about that time in August 2016.  The records do not reflect that she collapsed.  The records show that she told Dr. Basho that she went to the emergency room and her symptoms were relieved with steroids and pain medication.  Dr. Basho prescribed an NSAID for the pain.  After that one visit, Cook cited no records in which she sought treatment for

pain in her neck, back, and extremities from that date until more than nine months after the Date Last Insured.  The paucity of medical evidence supports the ALJ's conclusion that Cook's statements about her symptoms prior to the Date Last Insured were not supported by the other evidence in the record.

Cook argues that this case is like Cullinan v. Berryhill, 878 F.3d 598 (7th Cir. 2018).  The Cullinan case, unlike this case, did not involve a situation in which the claimant cited little evidence that she either reported disabling symptoms to her healthcare providers or that healthcare providers reported objective medical evidence of significant disabling impairments until long after the Date Last Insured.  The Cullinan case does not apply.

Cook argues that the ALJ erred because the ALJ did not discuss in the decision all five factors set forth in the regulations for evaluating medical opinions.  20 C.F.R. § 404.1520c(c). The Court disagrees.  The regulations state the ALJ is only required to discuss the factors of consistency and supportability in the decision.  20 C.F.R. § 404.1520c(b)(2).  The Court will not find error when the ALJ followed the regulations.

Cook argues that the Defendant Commissioner denied her right to property without due process.  Cook is wrong.  To have such a due process

claim, a person must establish that she has a property interest and that the state denied her that property without due process.  To have a property interest created by statute or regulation, the person must have a right to payment under the statute or regulation.  <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 332 (1976).  Cook applied for benefits, but she has no right to payment until benefits are awarded.  After benefits are awarded, then a disabled person has a property interest in those payments.  <u>Id</u>.  Moreover, Cook received due process.  She received notice and a full evidentiary hearing.  She further received a right to review by the Appeals Council and this Court.  She further may appeal this decision to the Court of Appeals. <u>See</u> <u>Id.</u>, at 333-34.  She has received all process that is due.  She has no claim for denial of property without due process.

THEREFORE, IT IS ORDERED that the Defendant Commissioner's Motion for Summary Affirmance (d/e 16) is ALLOWED; Plaintiff Sharilyn Anne Cook's Brief in Support of Motion for Summary Judgment (d/e 13) is DENIED; and the decision of the Defendant Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:   March 1, 2022

s/ *Tom Schanzle-Haskins*

TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE